**INSTITUTE OF CETACEAN RESEARCH, et al,**
**Plaintiffs,**

v.

**SEA SHEPHERD CONSERVATION SOCIETY, et al, Defendants.**

**CASE NO. C11-2043JLR**

United States District Court,
W.D. Washington,
at Seattle.

Signed December 20, 2015.

Filed December 21, 2015

James L. Phillips, Miller Nash Graham & Dunn LLP, Seattle, WA, M. Christie Helmer, John F. Neupert, Miller Nash Graham & Dunn LLP, Portland, OR, for Plaintiffs.

Claire Loebs Davis, Douglas W. Greene, Kristin Beneski, Lane Powell PC, Hilary V. Bricken, Harris & Moure PLLC, Seattle, WA, for Defendants.

## ORDER

JAMES L. ROBART, United States District Judge

### I. INTRODUCTION

This matter comes before the court on four dispositive motions and two discovery motions. Plaintiffs The Institute of Cetacean Research ("the Institute"), Kyodo Senpaku Kaisha, Ltd., and Tomoyuki Ogawa (collectively, "Plaintiffs")[1] move to dismiss all six of Defendants Sea Shepherd Conservation Society ("SSCS") and Paul Watson's (collectively, "Defendants") counterclaims. (See MTD (Dkt. #255); MTD Resp. (Dkt. #263); MTD Reply (Dkt. #265).) Alternatively, Plaintiffs moved for partial summary judgment on Defendants' fifth counterclaim, in which SSCS seeks damages for intentional or negligent de-

struction of property. (See 7/16/15 MPS J (Dkt. #257); 8/3/15 MPSJ Resp. (Dkt. #262); 8/7/15 MPSJ Reply (Dkt. #264); see also 2ACC ¶¶ 87-93.)[2] Plaintiffs' July 16, 2015 motion for partial summary judgment incorporated by reference Plaintiffs' still-pending April 9, 2015 motion for partial summary judgment, which also sought dismissal of SSCS's counterclaim for damages, and which the parties fully briefed. (See 4/9/15 MPSJ (Dkt. #228); 4/27/15 MPSJ Resp. (Dkt. #231); 5/1/15 MPSJ Reply (Dkt. #232).) Finally, Defendants moved for judgment on the pleadings on all of Plaintiffs' claims. (See MJP (Dkt. #260); MJP Resp. (Dkt. #266); MJP Reply (Dkt. #267).)

Defendants also filed two discovery motions. The first seeks to compel production from the Plaintiffs. (See MTC (Dkt. #271); MTC Resp. (Dkt. #277); MTC Reply (Dkt. #283).) The second asks the court to confirm that Defendants have unilaterally terminated the confidentiality agreement between the parties. (See MTCT (Dkt. #272); MTCT Resp. (Dkt. #280); MTCT Reply (Dkt. #286).)

Having considered the submissions of the parties, the appropriate portions of the record, and the relevant law, and having heard oral argument on December 15, 2015, the court GRANTS IN PART and DENIES IN PART the various motions, as detailed herein.

---

1. Defendants have asserted counterclaims, meaning Plaintiffs are also counterclaim defendants and Defendants are also counterclaim plaintiffs. For simplicity, the court refers to the parties based on the initial claim filed. When discussing counterclaims, "Plaintiffs" also includes Hiroyuki Komura, a defendant to Defendants' counterclaims. (2d Am. Counterclaims ("2ACC") (Dkt. #250) ¶.1, at 16.) Defendants allege Mr. Komura was the master of the Shonan Maru No. 2 when it collided with the Ady Gil in 2010 (id. ¶10), but

Mr. Komura has not asserted any claims against Defendants (see generally FAC).

2. Defendants' second amended answer and second amended counterclaims were filed conjunctively and paragraph numeration restarts in the section stating counterclaims. Accordingly, the court refers to the second section of that filing as the second amended counterclaims and cites it accordingly. (See 2ACC ¶¶ 1-100, at 16-45.)

## II. BACKGROUND

### A. Procedural History

Plaintiffs filed this case on December 8, 2011, invoking jurisdiction under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and seeking to enjoin Defendants' alleged dangerous behavior on the high seas in the Antarctic. (Compl. (Dkt. # 1).) Defendants answered and counterclaimed, seeking to enjoin Plaintiffs and collect damages for Plaintiffs' comparable actions. (Ans. (Dkt. # 94).) Following motions practice and a hearing, this court denied Plaintiffs' motion for a preliminary injunction on March 19, 2012. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 860 F.Supp.2d 1216 (W.D.Wash.2012). After Plaintiffs appealed that order, this court stayed proceedings on February 1, 2013. (Stay (Dkt. # 131).) The Ninth Circuit reversed this court's denial of a preliminary injunction on February 25, 2013, instituting a preliminary injunction "until further order" of the Ninth Circuit. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 708 F.3d 1099, 1106 (9th Cir. 2013). The Ninth Circuit insubstantially amended and superseded that order on May 24, 2013. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y (Cetacean I)*, 725 F.3d 940 (9th Cir.2013).

This case remained stayed while Plaintiffs brought contempt proceedings in the Ninth Circuit. On December 19, 2014, the Ninth Circuit held SSCS, Mr. Watson, and several non-parties to this suit liable for civil contempt. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y (Cetacean II)*, 774 F.3d 935, 959 (9th Cir.2014). The Ninth Circuit issued a contemporane-

ous decision rejecting several peripheral challenges to the injunction. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y (Cetacean III)*, 588 Fed.Appx. 701 (9th Cir.2014) (unpublished).[3]

On March 31, 2015, this court lifted its stay. (3/31/15 Min. Entry (Dkt. # 243).) Plaintiffs filed the operative first amended complaint on May 1, 2015 (*see* FAC (Dkt. # 234)), and Defendants answered that complaint and asserted counterclaims on June 30, 2015 (*see* FAC Ans. (Dkt. # 250); 2ACC). On June 4, 2015, pursuant to the Ninth Circuit's directive in *Cetacean II*, this court imposed coercive sanctions on the parties that had violated the injunction. (Sanct. Order (Dkt. # 239).) The case then proceeded, and the parties have since filed the motions addressed herein.

### B. Factual Background[4]

This is a case between Antarctic whalers and environmentalists that oppose whaling. The Institute is a Japanese foundation that performs lethal whaling in the Southern Ocean. (*See* FAC ¶¶ 3, 10.) Kyodo Senpaku, a Japanese corporation, owns the whaling vessels used by the Institute, and Mr. Ogawa is the Master of the Nisshin Mara, the "mother" ship of the Institute's whaling operations. (*See id.* ¶¶ 4-5.)

In 1982, the International Whaling Commission adopted a moratorium on commercial whaling, which took effect in 1986. (ICJ Ruling (Dkt. # 175-1) ¶ 100; *see also* 2ACC ¶ 16.) Under Article VIII of the International Convention for the Regulation of Whaling, however, this moratorium does not apply to whale hunting conducted

---

**3.** Under Ninth Circuit Rule 36–3(a), this unpublished opinion is precedential for this case. *See* Ninth Cir. R. 36–3(a).

**4.** The facts of this case are largely undisputed. Thus, although the court is cognizant of the differing inferential and evidentiary standards

applied to the various motions presented here, the facts as presented here come from the parties' pleadings. Except where specified, this factual narrative is consistent with both parties' pleadings.

in accordance with a "special permit" granted for purposes of scientific research by a signatory of the Whaling Convention. International Convention for the Regulation of Whaling [*hereinafter* Whaling Convention] art. VIII, Dec. 2, 1946, 62 Stat. 1716, 161 U.N.T.S. 74; (*see also* ICJ Ruling ¶ 55.) From 1987 to 2014, through a series of programs entitled JARPA and JARPA II, Japan has issued special permits to the Institute on an annual basis. (*See* ICJ Ruling ¶¶ 99-100.) These special permits allow the Institute to perform lethal whaling in the Southern Ocean.[5] (*See* FAC ¶ 11.) The Institute performs its Southern Ocean whaling operations from roughly December to March of each year. (*See id.* ¶ 12.)

Mr. Watson founded SSCS and served as its executive director until the Ninth Circuit issued its injunction. (*See* FAC ¶ 7; FAC Ans. ¶ 7; 2ACC ¶ 6.) SSCS's mission is "to end the destruction of habitat and slaughter of wildlife in the world's oceans." (*See* 2ACC ¶ 2.) To that end, from 2005 to 2012, SSCS collaborated with foreign Sea Shepherd entities[6] "on campaigns aimed at exposing and impeding [the Institute's] illegal killing of whales in the Southern Ocean." (*Id.* ¶ 28.) Those campaigns sought to "locate and follow" the Institute's whaling ships, "and frustrate its ... whale hunt." (*Id.*) Defendants take the position that notwithstanding the Institute's special permits from Japan, their whaling is non-scientific and thus contravenes the Whaling Convention and other international law. (*See id.* ¶¶ 19-20.)

Defendants' campaigns led to several nautical confrontations between Plaintiffs and Defendants. (*See* FAC ¶¶ 13-21; 2ACC ¶¶ 35-38.) The parties dispute who was the aggressor in these interactions, but the acts allegedly taken by one or both parties include ship ramming; throwing bottles of butyric acid, grappling hooks, glass bottles of paint, and smoke bombs and other incendiary devices; illegal boarding; targeting with flares, long-range acoustic devices, and water cannons; fouling rudders and propellers; assault; stabbing with bamboo poles; and general unsafe navigation. (*See* FAC ¶¶ 15, 20; 2ACC ¶¶ 35-38, 41, 43.) Plaintiffs have obtained preliminary injunctive relief against Defendants' acts of piracy and unsafe navigation. *See Cetacean I*, 725 F.3d at 947. The preliminary injunction bars Defendants from "physically attacking any vessel engaged by Plaintiffs ... in the Southern Ocean ... or from navigating in a manner that is likely to endanger the safe operation of any such vessel." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y (Cetacean Injunction)*, 702 F.3d 573, 573 (9th Cir. 2012); *Cetacean I*, 725 F.3d at 947 (ordering that the Ninth Circuit's injunction pending appeal in *Cetacean Injunction* "remain in effect until further order of the Ninth Circuit"). Furthermore, Defendants are "[i]n no event" to "approach [P]laintiffs any closer than 500 yards when [D]efendants are navigating on the open sea." *Id.* In subsequent proceedings, the Ninth Circuit found Plaintiffs in contempt of the injunction, *see Cetacean II*, 774 F.3d at 959, and this court issued civil contempt sanctions on Plaintiffs (*see* Sanct. Order).

In March of 2014, the International Court of Justice ("ICJ") ruled that JARPA

---

5. JARPA II, which replaced JARPA in 2005, allows the Institute an annual take of up to 935 minke whales, up to 50 fin whales, and up to 50 humpback whales. (*See* FAC ¶ 24.)

6. SSCS inspired a "loosely organized global conservation movement" of foreign entities that bear similar names. (2ACC ¶ 3.) The court refers to the defendant in this action as "SSCS," whereas it refers to SSCS's foreign counterparts—which are non-parties—as "Sea Shepherd." (*See id.*)

II is noncompliant with the Whaling Convention. (*See* ICJ Ruling.) In response, Japan declined to grant any special permits for the 2014-15 season, and Plaintiffs performed only sighting surveys. (*See* FAC ¶ 31.) Japan then developed a new plan for granting special permits entitled NEWREP-A. (*See id.;* 2ACC ¶ 27.) NEWREP-A lasts 12 years, beginning in the 2015-16 whaling season, and allows the Institute to kill up to 333 minke whales—but no other whale species—annually. (*See id.*) A scientific panel at the IWC has found that NEWREP-A—like JARPA II—lacks a scientific basis. (2ACC ¶ 60.)

Plaintiffs intend to recommence whaling in the 2015-16 season with a new special permit under Japan's NEWREP-A program. (FAC ¶ 31, 2ACC ¶ 60.) Defendants have pledged to abide by the preliminary injunction and "do not plan to ever participate again in a Southern Ocean whale-protection campaign." (Not. of Compliance (Dkt. # 248) at 2; 2ACC ¶ 5.) Nonetheless, foreign Sea Shepherd entities have continued their campaigns, allegedly with funding provided by SSCS. (*See* FAC ¶ 50.3; FAC Ans. ¶ 44.) The parties seek permanent injunctive relief protecting them from each other's allegedly unlawful behavior.

Both parties argue that the other has violated international law against perpetrating and funding piracy and unsafe navigation. (FAC ¶¶ 34-52; 2ACC ¶¶ 69-74, 82-86, 94-100.) These claims and counter-claims rely on substantially the same treaties and agreements to establish a law of nations prohibiting such behavior.[7] (*See id.*) Furthermore, Defendants seek to enjoin Plaintiffs' whaling as either a violation of international law established by the Whaling Convention, or as constituting piracy. (*See* 2ACC ¶¶ 59-68, 75-81.) Besides these claims for violations of the law of nations, Plaintiffs seek injunctive relief for Defendants' maritime torts (*see* FAC ¶¶ 53-56), and Defendants seek damages for Plaintiffs' tortious destruction of Defendants' property (*see* 2ACC ¶¶ 87-93). Both sides argue on various grounds that dismissal of all adverse claims is appropriate. The court details these motions individually below.

## C. Legal Standards

Two of the instant motions seek complete dismissal—Defendants' motion for judgment on the pleadings and Plaintiffs' motion to dismiss. These motions seek dismissal on three general bases: under Rule 12(b)(1), for lack of subject matter jurisdiction; under Rule 12(b)(6), for failure to state a claim; and under Rule 12(c), for failure to state a claim. The court first lays out those legal standards.[8]

### 1. Under Rule 12(b)(1)

A motion to dismiss for lack of subject matter jurisdiction is either facial or factual. *See Safe Air for Everyone v. Meyer,*

7. The primary international agreements on which the parties base their arguments include the United Nations Convention on the Law of the Sea [*hereinafter* UNCLOS], Dec. 10, 1982, 1833 U.N.T.S. 397; the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation [*hereinafter* SUA Convention], Mar. 10, 1988, S. Treaty Doc. No. 101-1, 1678 U.N.T.S. 222; the United Nations International Convention for the Suppression of the Financing of Terrorism [*hereinafter* Financing Convention], Dec. 9, 1999, 2178 U.N.T.S. 197; the Convention on

the International Regulations for Preventing Collisions [*hereinafter* COLREGS], Oct. 20, 1972, 28 U.S.T. 3459, 1050 U.N.T.S. 18; and the Whaling Convention.

8. To the extent the court substantively addresses the other pending motions, which seek partial summary judgment and resolution of discovery disputes, the court sets forth the legal standard governing those motions in the relevant subsection below.

373 F.3d 1035, 1039 (9th Cir.2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* The court accepts the factual allegations in the complaint as true, and the nonmoving party is entitled to have those facts construed in the light most favorable to it. *Fed'n of African Am. Contractors v. City of Oakland,* 96 F.3d 1204, 1207 (9th Cir.1996). However, if the moving party "convert[s] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.,* 343 F.3d 1036, 1039 n.2 (9th Cir.2003) (citing *St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir.1989)). In either instance, the party asserting its claims in federal court bears the burden of establishing subject matter jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).

## 2. Under Rule 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court construes the complaint in the light most favorable to the nonmoving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 946 (9th Cir.2005). The court must accept all well-pleaded allegations of material fact as true and draw all reasonable inferences in favor of the plaintiff. *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 135 F.3d 658, 661 (9th Cir.1998). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S.

662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also Telesaurus VPC, LLC v. Power,* 623 F.3d 998, 1003 (9th Cir.2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 663, 129 S.Ct. 1937.

The court, however, need not accept as true a legal conclusion presented as a factual allegation. *Id.* at 678, 129 S.Ct. 1937. Although the pleading standard announced by Federal Rule of Civil Procedure 8 does not require "detailed factual allegations," it demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). A pleading that offers only "labels and conclusions or a formulaic recitation of the elements of a cause of action" will not survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Id.*

## 3. Under Rule 12(c)

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed. *See* Fed. R. Civ. P. 12(c). A court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard,* 581 F.3d 922, 925 (9th Cir.2009) (citation omitted); *see also Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health,* 654 F.3d 919, 925 (9th Cir.2011) (explaining that the court "assume[s] the facts alleged in the complaint are true"). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Id.; see Lyon v. Chase*

*Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir.2011).

When a Rule 12(c) motion is used as a vehicle for a Rule 12(b)(6) motion after an answer has been filed, or when it is functionally equivalent to a motion to dismiss for failure to state a claim, the same standard applies to both. *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir.1989); *see Seabright Ins. Co. v. Matson Terminals, Inc.*, 828 F.Supp.2d 1177 (D.Haw.2011) (observing that the motions differ in time of filing but are otherwise functionally identical and require same standard of review). Dismissal for failure to state a claim "is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir.2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988)).

### III. DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

#### A. Background

Defendants seek judgment on the pleadings as to all five of Plaintiffs' claims. They argue that *Kiobel v. Royal Dutch Petroleum Co.*, —— U.S. ——, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013), narrowed the ATS's scope and thereby rendered Plaintiffs' claims for freedom of safe navigation and piracy outside of this court's subject matter jurisdiction. (*See* MJP at 12-18.) In the alternative, Defendants contend that there is no enforceable international norm against endangering safe navigation, and that claim (1) therefore fails on the merits. (*See id.* at 7-12.) Defendants also dispute whether the Financing Convention supports a private right of action, either on its own or as a manifestation of an enforceable international norm. (*See id.* at 18-21.) As to Plaintiffs' maritime tort claims, De-

fendants argue the pleadings are insufficient because they fail to provide important information for purposes of analyzing maritime jurisdiction or choice of law. (*See id.* at 21-24.) Finally, Defendants and Plaintiffs agree that the court resolved claim (5), which seeks coercive contempt sanctions, in its June 4, 2015, order. (*Id.* at 24; MJP Resp. at 16; Sanct. Order at 2.)

#### B. Analysis

##### 1. Claim (1): Freedom of Safe Navigation

Because Defendants' *Kiobel* argument implicates the court's subject matter jurisdiction, the court analyzes that argument first.

###### a. ATS Jurisdiction Post-Kiobel

Defendants argue that the ATS, as interpreted in *Kiobel*, places Plaintiffs' claim for freedom of safe navigation outside of this court's subject matter jurisdiction. (MJP at 12-16.) The Supreme Court decided *Kiobel* on April 17, 2013, shortly after the Ninth Circuit reversed this court's denial of a preliminary injunction. *See Cetacean I*, 725 F.3d at 940. Plaintiffs do not dispute that *Kiobel* narrowed federal court jurisdiction under the ATS, but they argue that *Cetacean III* and prior determinations by this court nonetheless dictate the outcome on the issue. (MJP Resp. at 6-8.) Even if not, Plaintiffs argue that *Kiobel* does not foreclose subject matter jurisdiction in this court.

###### i. Mandate Doctrine

 "For the sake of efficiency and consistency, a decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *Snow–Erlin v. United States*, 470 F.3d 804, 807 (9th Cir.2006) (internal quotations omitted). However, this rule— called the rule of mandate—recognizes

that district courts " 'are often confronted with issues that were never considered by the remanding court.' " *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000) (quoting *Biggins v. Hazen Paper Co.*, 111 F.3d 205, 209 (1st Cir.1997)). Accordingly, district courts are empowered to determine "anything not foreclosed by the mandate, and, under certain circumstances, an order issued after remand may deviate from the mandate ... if it is not counter to the spirit of the circuit court's decision." *Kellington*, 217 F.3d at 1092–93 (internal citations and quotations omitted). Nonetheless, the court's first point of reference is the Ninth Circuit's prior rulings in the case.

Given this case's timeline, the Ninth Circuit had a meaningful opportunity to address the implications of *Kiobel* only during the contempt proceedings. There is no mention of *Kiobel* in *Cetacean II*; only *Cetacean III* discusses *Kiobel's* impact.[9] The whole of the memorandum opinion's discussion of *Kiobel* reads:

> *Kiobel* concerns the reach of the Alien Tort Statute, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. We construe the Defendants' argument, which is not adequately briefed, as a challenge to the district court's jurisdiction to hear the

Plaintiffs' claims. We also reject this argument. The Plaintiffs' piracy claims fall within the ambit of the Alien Tort Statute because piracy is a violation of the law of nations. *See Sosa v. Alvarez–Machain*, 542 U.S. 692, 720, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (noting that Congress "may well" have had actions arising out of piracy in mind when it enacted the Alien Tort Statute); *United States v. Smith*, 18 U.S. 153, 161, 5 Wheat. 153, 5 L.Ed. 57 (1820) ("The common law, too, recognises and punishes piracy as an offence, not against its own municipal code, but as an offence against the law of nations, (which is part of the common law,) as an offence against the universal law of society, a pirate being deemed an enemy of the human race.").

*Cetacean III*, 588 Fed.Appx. at 702[10]

Defendants argue that although "various defendants in the contempt action raised *Kiobel*," the Ninth Circuit intended to leave its application to this court. (MJP at 14.) In light of the language above, the court disagrees. Although the Ninth Circuit recognized the "inadequate briefing" and rejected the *Kiobel* argument in summary fashion, its language is unequivocal—the Court considered and rejected Defendants' *post-Kiobel* jurisdictional argument because piracy on the high seas has historically been within the federal courts' jurisdiction under the ATS. *See*

---

9. The Ninth Circuit also mentions *Kiobel* in its August 13, 2013 order (*see* Dkt. # 162 at 1-2) but performs no analysis that has any bearing here.

10. Although the quoted language from *Cetacean III refers* to "piracy," the Ninth Circuit's prior rulings in this case make clear that the reference to Plaintiffs' "piracy claims" includes Plaintiffs' claim for safe navigation on the high seas. *See Cetacean I*, 725 F.3d at 942–44 (analyzing what constitutes piracy, and concluding that unsafe navigation and

more direct acts of violence suffice), 945 ("The district court overlooked the actual language of the Convention, which prohibits 'endanger[ing] safe navigation.' This requires only that [SSCS] create dangerous conditions, regardless of whether the harmful consequences ever come about." (internal citations omitted) (alterations in original)). Accordingly, notwithstanding the Ninth Circuit's use of the term "piracy," the foregoing analysis applies equally to Plaintiffs' claim for endangering safe navigation.

*Cetacean III*, 588 Fed.Appx. at 702. There is no indication that the Ninth Circuit sought to have this court reconsider the *Kiobel* argument. *Id.* Moreover, if the ATS does not confer jurisdiction over Plaintiffs' claims, the Ninth Circuit's injunction would be outside its own power—an implication the Court of Appeals is unlikely to have overlooked. The court accordingly concludes that the Ninth Circuit intended for its analysis of *Kiobel* to be part of the mandate to this court. Nonetheless, in light of the "inadequate briefing" recognized in *Cetacean III and* the court's ongoing obligation to assess its own subject matter jurisdiction, *see* Fed. R. Civ. P. 12(h)(3), the court performs its own analysis of whether *Kiobel* places Plaintiffs' claims outside the jurisdictional reach of the ATS.

### ii. *Kiobel* and the ATS

■ The court's own analysis confirms that *Cetacean III* accurately analyzed the *post-Kiobel* scope of the ATS. Understanding *Kiobel's* jurisdictional limitations begins with the substantive limitations on ATS claims imposed in *Sosa v. Alvarez–Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). In *Sosa*, the Supreme Court determined that the ATS is jurisdictional and does not set forth a "new cause of action for torts in violation of international law." *Id.* at 713, 124 S.Ct. 2739. This determination could have rendered the ATS "stillborn," which would allow claims only when provided for by "a further statute expressly authorizing adoption of causes of action." *Id.* The Court instead concluded that the ATS authorizes "federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Id.* at 712–13, 124 S.Ct. 2739.

The *Sosa* Court found that the Congress that enacted the ATS envisioned three paradigmatic violations of the law of nations: "violation of safe conducts, infringement on the rights of ambassadors, and piracy." *Id.* at 724, 124 S.Ct. 2739. Those causes of action are not static, however, and the primary holding of *Sosa* is that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to" safe conduct, rights of ambassadors, and piracy.[11] *Id.* at 725, 124 S.Ct. 2739; *see also Kiobel*, 133 S.Ct. at 1671 (Breyer, J., dissenting) ("*Sosa* essentially leads today's judges to ask: Who are today's pirates?"). To apply this standard, "courts focus on whether a contemporary international legal norm underlying a proposed ATS claim is 'specific, universal, and obligatory.'" *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1019 (9th Cir. 2014) (quoting *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir.1994)). *Sosa* also cautioned courts to consider "practical consequences" when determining whether to recognize a cause of action under the ATS. *Sosa*, 542 U.S. at 732, 124 S.Ct. 2739; *see also Doe I,* 766 F.3d at 1019.

*Kiobel* left intact *Sosa's* analytical framework to determine whether a cause of action lies, but it altered the jurisdictional analysis under the ATS. 133 S.Ct. at 1663. The plaintiffs in *Kiobel* alleged that human rights violations in Nigeria violated customary international law. *Id.* at 1662–

11. "The body of international law that supplies the norms underlying an ATS claim is often referred to as customary international law." *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1019 (9th Cir.2014) (internal quotations omitted); *see also Abagninin v. AMVAC Chem.* *Corp.*, 545 F.3d 733, 738 (9th Cir.2008) ("The law of nations is synonymous with 'customary international law,' and violations of international law must contravene a norm that is specific, universal, and obligatory." (internal citations omitted)).

63. The Supreme Court analyzed "whether a claim may reach conduct occurring in the territory of a foreign sovereign," and held that "the presumption against extraterritoriality applies to claims under the ATS." *Id.* at 1664, 1669. In other words, the underlying cause of action—which courts analyze under the *Sosa* framework—must provide a "clear indication of extraterritoriality" in order for the ATS to grant jurisdiction over the claim. *Id.* (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010)). Whereas "[a]pplying U.S. law to pirates ... does not typically impose the sovereign will of the United States onto conduct occurring within the territorial jurisdiction of another sovereign," applying American law to alleged human rights violations in Nigeria would certainly do so. *Id.* at 1667. Accordingly, the *Kiobel* Court concluded that the alleged violations did not "touch and concern" the United States, did not overcome the presumption against extraterritoriality, and were thus outside of the federal jurisdiction conferred by the ATS. *Id.*

Defendants assert that there "is no piracy exception to the rule announced in *Kiobel*," and that therefore the court does not have jurisdiction over claims (1) and (2) because the claims do not "touch and concern" the United States.[12] (MJP at 17.) Although the *Kiobel* Court deliberately "le[ft] open a number of significant questions regarding the reach and interpretation of the" ATS, 133 S.Ct. at 1669 (Kennedy, J., concurring), the *Kiobel* opinion's discussion of piracy belies Defendants' assertion, *see id.* at 1667.[13] The Court recognized that when Congress passed the First Judiciary Act in 1789, "[p]irates were fair game wherever found, by any nation, because they generally did not operate within any jurisdiction." *Id.* In other words, Congress recognized that piracy occurs "on the high seas, beyond the territorial jurisdiction of the United States or any other country." *Id.* (recognizing that the Supreme Court "has generally treated the high seas the same as foreign soil for purposes of the presumption against extraterritorial application"). Nonetheless, the Court used "[p]iracy... on the high seas" as the paradigmatic example of a cause of action in which the ATS *does* extend jurisdiction extraterritorially. *Id.*; *see also id.* at 1666 (contrasting piracy with violations of safe conduct and infringements on the rights of ambassadors, neither of which has any "necessary extraterritorial application").

---

12. SSCS is headquartered in Washington and organized in Oregon, and Mr. Watson is a permanent resident of the United States. (FAC ¶¶ 6-7.) Thus, to the extent the *Kiobel* Court sought to prevent the United States from becoming a "safe harbor" for pirates and other enemies of mankind, this action touches and concerns the United States at least minimally. *See Kiobel*, 133 S.Ct. at 1671 (Breyer, J., concurring in the judgment) (citing *Sosa*, 542 U.S. at 732, 124 S.Ct. 2739).

13. Several federal district courts have read *Kiobel* to exempt piracy claims from its "touch and concern" analysis. *See, e.g., Shell Offshore Inc. v. Greenpeace, Inc.*, No. 3:15-cv-00054-SLG, 2015 WL 3745641, at *3 (D.Alaska June 12, 2015) ("The Court finds that the alleged conduct in the Complaint, even if it is not piracy, is sufficiently akin to piracy so as to fall within that exception to the presumption against extraterritoriality, particularly when the extraterritorial scope of the Court's jurisdiction is extended only to the high seas."); *Mwani v. Laden*, 947 F.Supp.2d 1, 4 n. 3 (D.D.C.2013) ("This is aside from acts involving pirates or occurring on the high seas, for which jurisdiction under the ATS remains."); *Sexual Minorities Uganda v. Lively*, 960 F.Supp.2d 304, 322 n. 7 (D.Mass. 2013) ("In extreme cases, piracy for example, *Kiobel* noted that the ATS would provide jurisdiction over claims against foreign nationals for tortious conduct committed wholly in a foreign country, on the ground that it carried less direct foreign policy consequences." (internal citations omitted)).

*Kiobel* thus makes clear that although the presumption against extraterritoriality applies to the ATS, the presumption does not bar claims for piracy on the high seas. *Id.* at 1667 ("We do not think that the existence of a cause of action against [pirates] is a sufficient basis for concluding that other causes of action under the ATS reach conduct that does occur within the territory of another sovereign; pirates may well be a category unto themselves.").[14] This conclusion is consonant with the prudential considerations highlighted in *Kiobel*, in that the high seas are "beyond the territorial jurisdiction of the United States or any other country," and thus "[a]pplying U.S. law to pirates ... does not typically impose the sovereign will of the United States onto conduct occurring within the territorial jurisdiction of another sovereign." *Id.* The court therefore concludes that even if the Ninth Circuit did not intend its brief discussion *of Kiobel in Cetacean III* to be binding, the court has jurisdiction over claim (1) under the ATS.

### b. "Safe Navigation" as an Enforceable International Norm

■ Defendants also attack Plaintiffs' claim for "safe navigation" (*see* MJP at 7-12) by arguing that "freedom from safe navigation on the high seas" (*see* FAC ¶¶ 34-39.3) is insufficiently "specific, universal, and obligatory" to qualify as an enforceable international norm, *see Sosa*, 542 U.S. at 732, 124 S.Ct. 2739. Plaintiffs respond that the Ninth Circuit conclusively determined this question in *Cetacean I* when it stated: "Cetacean has done nothing to acquire the rights to safe navigation and protection from pirate attacks; they flow automatically from customary interna-

tional law and treaties." (*See* MJP Resp. at 6 (quoting *Cetacean I*, 725 F.3d at 947).)

Defendants again seek to relitigate an issue that the Ninth Circuit considered and determined. In *Cetacean I*, the Ninth Circuit analyzed Plaintiffs' likelihood of succeeding on the merits of their safe navigation claim. *See Cetacean I*, 725 F.3d at 944-45. Defendants recognize this inquiry but contend that it "assumed, without deciding, that [Plaintiffs] had stated a claim for safe navigation," and therefore is not binding. (*See* MJP Reply at 9.) Nowhere does the Ninth Circuit identify such an assumption, and indeed, such an assumption is incompatible with the Ninth Circuit's analysis of Plaintiffs' likelihood of success on the merits. *See Cetacean I*, 725 F.3d at 944-45.

Defendants argue that *Snow–Erlin* supports their argument that the Ninth Circuit left this issue undecided (See MJP Reply at 9.) In *Snow–Erlin*, the Ninth Circuit expressly "took the claim *as alleged* on the face of the complaint... in order to decide solely the underlying statute of limitations question," then remanded to the district court. 470 F.3d at 808. On remand, the district court recharacterized one of the plaintiff's claims over the plaintiff's objection that the Ninth Circuit had already decided the issue. *See id.* at 807. On a second appeal, the Ninth Circuit affirmed this recharacterization because in the first appeal the Ninth Circuit had *assumed* the claim was proper, and therefore the Night Circuit's first determination was not binding. *See id.* In *Cetacean I*, by contrast, the Ninth Circuit made no such assumption.

---

14. An alternative to framing piracy as an exception to the presumption against extraterritoriality is to infer from the United States' historical treatment of piracy on the high seas a "clear indication of extraterritoriality" of

that cause of action. This interpretation would overcome—rather than create an exception to—the presumption announced in *Kiobel*. Both characterizations yield the same result in this case.

Instead, the Ninth Circuit analyzed Plaintiffs' likelihood of succeeding on the merits of their safe navigation claim and concluded that this court abused its discretion in determining that Plaintiffs were unlikely to succeed. *See Cetacean I*, 725 F.3d at 944–45. The premise that Plaintiffs' safe navigation claim is legally cognizable is necessary to the Ninth Circuit's conclusion that the claim had a likelihood of success on the merits. Moreover, *Cetacean I* expressly analyzes the SUA Convention, UNCLOS, and COLREGS, and the Ninth Circuit concludes that those agreements support claims under the ATS for piracy and unsafe navigation. *See Cetacean I*, 725 F.3d at 945 ("The SUA Convention prohibits acts that endanger, or attempt to endanger the safe navigation of a s h i p.... The COLREGS state obligatory and universal norms for navigating ships so as to avoid collision."). In other words, the Ninth Circuit "actually... decided the matter, explicitly or by necessary implication," in *Cetacean I*. *Snow–Erlin*, 470 F.3d at 807. This circumstance distinguishes this case from *Snow–Erlin*. The court is therefore bound by *Cetacean I's* conclusion that safe navigation satisfies *Sosa*.

### 2. Claim (2): Freedom from Piracy

The *Kiobel*-based jurisdictional argument analyzed above comprises Defendants' only challenge to Plaintiffs' claim for freedom from piracy. For the reasons stated above, the court concludes that (1) the Ninth Circuit previously determined that *Kiobel* does not eliminate the court's subject matter jurisdiction, *see supra* Part III.B.1.a.i.; and (2) even if the Ninth Circuit's laconic determination was not intended to bind this court on remand, *Kio-*

*bel* demonstrates that the presumption against extraterritoriality does not preclude claims for piracy on the high seas, *see supra* Part III.B.1.a.ii. Accordingly, the court denies Defendants' motion for judgment on the pleadings as to Plaintiffs' claim for freedom from piracy.

### 3. Claim (3): Freedom from Terrorism

Defendants next seek dismissal of Plaintiffs' freedom from terrorism [15] claim. (*See* MJP at 18-21.) Plaintiffs' amended complaint is not crystal clear as to the cause of action and theory of liability. (*See* FAC ¶¶ 48-52.) However, Plaintiffs clarify their legal theory in their response to Defendants' motion for judgment on the pleadings. (*See* MJP Resp. at 8-12.) Plaintiffs contend that the Financing Convention sets forth two norms that qualify as customary international law under the ATS. (*See* MJP Resp. at 8-12.) Article 2, Section 1 of the Financing Convention states:

Any person commits an offence ... if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:

(a) An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex; or

(b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a popula-

---

**15.** This title for Plaintiffs' third claim comes from the amended complaint, although it inaptly describes what is in reality a claim for funding both piracy and unsafe navigation in contravention of the law of nations. (*See* FAC at 25; *id.* ¶¶ 48-52.) At oral argument, all parties acknowledged the Ninth Circuit did not address this claim on appeal.

tion, or to compel a government or an international organization to do or to abstain from doing any act.

Financing Convention art. 2 § 1, Annex.[16] Plaintiffs argue that Defendants violated Section 1(a) by providing funding, ships, and other assets to foreign Sea Shepherd entities, with the intent that those assets be used to commit piracy and unsafe navigation in violation of the SUA Convention. (*See* FAC ¶¶ 50.1, 50.3.) Plaintiffs also allege that Defendants violated Section 1(b) by providing those assets "in an effort to compel the government of Japan to cease its authorization of research whaling." (*Id.* ¶ 50.2.) The court analyzes these claims in turn.

*a. Funding Violations of the SUA Convention in Violation of Article 2, Section 1(a) of the Financing Convention*

■■■■ Defendants allegedly provide funds to foreign Sea Shepherd entities with the intent that Sea Shepherd entities commit piracy or endanger safe navigation.

(*Id.* ¶¶ 50.1, 50.3.) Plaintiffs contend these acts contravene a specific, universal, and obligatory international norm, as required to sustain a cause of action under the ATS. *See Sosa*, 542 U.S. at 732, 124 S.Ct. 2739; Financing Convention art. 2 § 1. As analyzed above, the Ninth Circuit concluded, based upon international norms expressed in the SUA Convention, UNCLOS, and COLREGS, that Plaintiffs' allegations of piracy and endangering safe navigation are sufficient to sustain a private action under the ATS. *See supra* Part III.B.1.a. (citing *Cetacean I*, 725 F.3d at 945). The Financing Convention expressly prohibits intentionally or knowingly funding such activities, with specific reference to violations of the SUA Convention. *See* Financing Convention art. 2 § 1, Annex. This similarity in offenses—*funding* piracy and unsafe navigation versus *perpetrating* piracy and unsafe navigation—leads the court to conclude that violation of Article 2, Section 1(a) of the Financing Convention satisfies *Sosa's* specificity requirement.[17]

**16.** As used in the Financing Convention, "funds" means "assets of every kind, whether tangible or intangible, movable or immovable, however acquired." Financing Convention art. 1. § 1. The treaties listed in the annex to the Financing Convention are:

1. Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague on 16 December 1970.
2. Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on 23 September 1971.
3. Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, adopted by the General Assembly of the United Nations on 14 December 1973.
4. International Convention against the Taking of Hostages, adopted by the General Assembly of the United Nations on 17 December 1979.
5. Convention on the Physical Protection of Nuclear Material, adopted at Vienna on 3 March 1980.

6. Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, supplementary to the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on 24 February 1988.
7. Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, done at Rome on 10 March 1988
8. Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms located on the Continental Shelf, done at Rome on 10 March 1988.
9. International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations on 15 December 1997.

Financing Convention Annex.

**17.** Defendants spend significant verbiage arguing that there is no international norm against terrorism that is sufficient to ground an ATS claim. (*See* MJP at 19-20; MJP Reply at 9-11.) The court is persuaded by that argu-

It is less clear that the norms expressed in Section 1(a) are "universal" and "obligatory." *See Sosa*, 542 U.S. at 732, 124 S.Ct. 2739. The three district courts that have addressed whether the norms expressed in the Financing Convention are sufficiently universal and obligatory have reached differing conclusions. Section 1(a), which also proscribes funding violations of the Bombing Convention, contributed to the Eastern District of New York's conclusion that there is a specific, universal, and obligatory international norm against financing civilian bombings. *See Almog v. Arab Bank, PLC*, 471 F.Supp.2d 257, 276–80 (E.D.N.Y. 2007). The court noted that the Financing Convention "has been ratified by over 130 countries, including the United States." *Id.* at 277. However, the court also gave weight to corresponding norms expressed in the Geneva Conventions and several literary sources; in other words, the *Almog* court's determination that the norm expressed in the Financing Convention was universal and obligatory relied in part on other sources of international law. *See id.* at 277–78.

On the other hand, the Southern District of Florida has expressly concluded that "the Financing Convention does not establish a *universally accepted* rule of customary international law" because it has not been ratified by an "overwhelming majority" of states. *Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 792 F.Supp.2d 1301, 1318–19 (S.D.Fla.2011) (citing *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003)). At the time the *Chiquita* court evaluated the Financing Convention, only

111 nations—58 percent of the world—had ratified the treaty. *Id.* at 1319. The court also reasoned that the "many declarations and reservations, i.e., non-consents and varying interpretations" undermined the Financing Convention's evidentiary value. *Id.* The court accordingly concluded that financing terrorism is not actionable under the ATS. *Id.* at 1321; *see also Barboza v. Drummond Co.*, No. 06–61527–CIV, 2007 WL 8025825, at *11–12 (S.D.Fla. July 17, 2007) (concluding that financing terrorism is an insufficient cause of action because terrorism is too vague and internationally disputed to constitute an enforceable customary international law).

Two facets of *Almog* distinguish it from *Barboza* and *Chiquita:* the specificity of the putative international norm and the evidentiary support for the norm outside of the Financing Convention. As compared to this case, the court finds *Almog's* facts more analogous and rationale more persuasive. Both *Barboza* and *Chiquita* reject arguments that "financing terrorism" violates a universal and obligatory international norm. *See Barboza*, 2007 WL 8025825, at *11 ("Unlike the plaintiffs in *Almog*, Plaintiffs here have asserted only claims of terrorism in general, not acts of terrorism as specifically defined in a recognized norm of customary international law."); *Chiquita*, 792 F.Supp.2d at 1318 ("*Almog* is ... distinguishable in that the court there did not recognize an ATS claim for terrorism in general Rather, *Almog* rested its holding on ... suicide bombings and assassinations of civilians. Indeed, the court explained that its holding was ... not based upon a cause of action for 'ter-

---

ment and finds it relevant to analyzing whether Article II, Section 1(b) of the Financing Convention can ground a claim under the ATS. *See infra* Part III.B.3.b. In contrast to the broad swath of Section 1(b), however, Section 1(a) proscribes funding violations of nine *specific* international agreements. *See* Fi-

nancing Convention art. 1 § 1(a), Annex. This norm is narrowly drawn in comparison to Section 1(b), which leads the court to conclude that Defendants' arguments about the definition and acceptance of an international norm against terrorism are inapplicable to the court's analysis of Section 1(a).

rorism' generally."). In contrast, the financing violations in *Almog* are specific to the Bombing Convention. *See Almog*, 471 F.Supp.2d at 277–78, 280. Plaintiffs' claim under the Financing Convention similarly alleges funding a violation of a treaty listed in its Annex. *See* Financing Convention art. 2 § 1(a), Annex; *see also supra* Note 16. This specificity lessens the relevance of Defendants' argument—and the conclusions in *Barboza* and *Chiquita*—that "the Financing Convention neither codifies nor creates an international-law norm against terrorism or financing terrorism." (MJP at 19 (citing *Chiquita*, 792 F.Supp.2d at 1318).)

Several reasons distinct from the Financing Convention bolster the conclusion that the international norm against funding piracy and unsafe navigation is universal and obligatory. *See Sosa*, 542 U.S. at 734, 124 S.Ct. 2739 (quoting *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900)) ("[W]here there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators." (alterations in original)). First, piracy itself is the paradigmatic example of a violation of customary international law. *Sosa*, 542 U.S. at 724–25, 124 S.Ct. 2739. Although funding piracy is a different offense, the close relation between the two provides some evidence of general acceptance of a norm against funding piracy. *See Almog*, 471 F.Supp.2d at 280–85 (combining the analysis of an international norm against civilian bombings, as stated in the Bombing Convention, with the analysis of an international norm *against financing* civilian bombings, as stated in the Financing Convention). Furthermore, the SUA Convention provides for aiding and abetting liability, which bolsters this inference and evidences acceptance of a norm against funding piracy and unsafe navigation. *See* SUA Convention art. 2 § 2.2 ("Any person also commits an offence if that person ... abets the commission of any of the offences [previously identified]."). Finally, unlike in *Barboza* and *Chiquita*, the various countries' reservations and declarations [18] to the Financing Convention largely pertain to unrelated components of the Convention. *See Almog*, 471 F.Supp.2d at 282; Declarations and Reservations to the Financing Convention, *available at* https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-11&chapter=18&lang=en (listing only 21 of the 187 current parties to the Financing Convention as objectors to its incorporation of the SUA Convention). The court therefore concludes that the international norm against financing piracy and unsafe navigation is sufficiently specific; universal, and obligatory to sustain a cause of action, and the court denies Defendants' motion for judgment on the pleadings as to that claim.

The court reaches this determination mindful of the Supreme Court's admonition to exercise "judicial caution when considering the kinds of individual claims that might implement" ATS jurisdiction. *Sosa*, 542 U.S. at 725, 124 S.Ct. 2739. Foreign affairs consequences, in which the judiciary impinges on the legislative and executive branches, are an important reason to

---

**18.** A reservation is "a unilateral statement made by a state ... whereby it purports to exclude or modify the legal effect of certain provisions of that agreement." *See* Restatement (Third) of Foreign Relations Law of the United States § 313 cmt. a (1987). A state may also issue a declaration, which is often similar to a reservation except that it "purports to be an 'understanding,' an interpretation of the agreement in a particular respect." *Id.* cmt. g.

exercise such caution. *See id.* at 727–28, 124 S.Ct. 2739. Nevertheless, the Ninth Circuit has already concluded claims (1) and (2), for piracy and unsafe navigation, state enforceable international norms. *See Cetacean I*, 725 F.3d at 944–45; *supra* Part III.B.1.b. Given that reality, the court foresees no unrealized foreign policy implications from recognizing claims *for financing* piracy and unsafe navigation, and thus comity concerns do not alter the court's conclusion on this claim.

### b. Funding Terrorism in Violation of Article 2, Section 1(b) of the Financing Convention

■ Plaintiffs also allege that Defendants have funded "acts intended to cause death or serious bodily injury to a civilian" with the purpose of compelling the Japanese government to cease authorizing research whaling. (FAC ¶¶ 49.2, 50.2 (citing Financing Convention art. 2 § 1(b)).) Defendants characterize this as a claim for financing terrorism and argue that no specific, universal, and obligatory international norm against terrorism—or financing terrorism—exists. (*See* MJP at 19-21.) Plaintiffs mount an inapposite opposition, arguing that the court "is not being asked to *create* a definition of 'terrorism'" because the Financing and SUA Conventions do so. (MJP at 11.) This inaccurately describes Section 1(b), however, which in contrast to Section 1(a) does not incorporate the specific "treaties listed in the annex" to the Financing Convention. *Compare* Financing Convention art. 2 § 1(b) *with id.* § 1(a).

The court agrees with the numerous federal courts that have concluded, *post-Sosa*, that there is no enforceable international norm against terrorism. *See, e.g., Chiquita*, 792 F.Supp.2d at 1316–19; *Barboza*, 2007 WL 8025825, at *10–11; *Krishanthi v. Ra-* *jaratnam*, No. 09–CV–05395 (DMC–JAD), 2010 WL 3429529, at *10–11, *13 (D.N.J. Aug. 26, 2010). Terrorism defies a narrow definition. *See United States v. Yousef*, 327 F.3d 56, 106–08 (2d Cir.2003). Furthermore, acceptance of norms against terrorism is disuniform. *See Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 795 (D.C.Cir. 1984) ("While this nation unequivocally condemns all terrorist attacks, that sentiment is not universal. Indeed, the nations of the world are so divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area of harmony or consensus."). A putative norm against financing terrorism is likewise insufficiently "specific, universal, and obligatory." *See Sosa*, 542 U.S. at 732–33, 124 S.Ct. 2739. The court therefore dismisses Plaintiffs' claim (3) to the extent it seeks to broadly enjoin financing terrorism.

### 4. Claim (4): Maritime Law Claims

■ Defendants also contend that Plaintiffs' maritime tort claims should be dismissed for insufficient pleading. Specifically, Defendants contend that Plaintiffs' pleadings fail to establish maritime jurisdiction and fail to include sufficient facts to analyze the applicable law. (*See* MJP at 21-25; *see also* FAC ¶¶ 53-56.) Defendants provide little argument on maritime jurisdiction, except to the extent that the jurisdictional analysis happens to overlap with choice-of-law analysis. (*See* MJP at 21.) Defendants cite prior language from the court that Plaintiffs' "invocation of admiralty jurisdiction has so far been largely pro forma."[19] (3/19/12 Order (Dkt. # 95) at 27; *see also* MJP at 21-22.) However, the court concluded in the same order that it has subject matter jurisdiction over Plaintiffs' admiralty claims. (*See* 3/19/12 Order

---

**19.** When referring to jurisdiction, "admiralty" and "maritime" are synonymous. *See Ad-* *miralty and Maritime Jurisdiction*, Black's Law Dictionary (10th ed. 2014).

at 13.) Defendants have not indicated any change that would render infirm the court's conclusion. (*See* MJP at 21–22.) Accordingly, the court rejects Plaintiffs' effort to dismiss the maritime claims for lack of subject matter jurisdiction.

 Defendants also contend that Plaintiffs' "vague [maritime] claim fails to plead facts necessary ... to engage in the choice-of-law analysis that would be required for the identification and adjudication of any maritime common-law tort claim." (MJP at 21.) The *Lauritzen* factors provide guideposts for a court performing choice-of-law analysis on a maritime common law claim. *See Lauritzen v. Larsen*, 345 U.S. 571, 583–93, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). The factors are: (1) place of the wrongful act; (2) law of the flag, i.e., nationality of the vessels; (3) allegiance or domicile of the injured; (4) allegiance of the defendant shipowner; (5) place of contract; (6) inaccessibility of foreign forum; and (7) law of the forum. *Id.* This list is non-exhaustive, and the Supreme Court has added to it the shipowner's base of operations. *See Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 308–09, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). Moreover, not all factors merit equal consideration. *See, e.g., Lauritzen*, 345 U.S. at 584–85, 73 S.Ct. 921 (explaining the "cardinal importance" of the law of the flag, which is dispositive as to the applicable law unless "some heavy counterweight" overcomes it). Defendants contend that because Plaintiffs' amended complaint "includes no reference to the flags flown by any of the vessels in the alleged events"—a "cardinal" factor in performing choice of law analysis—it is "impossible to determine from the face of the Complaint what body of substantive law should apply to the [maritime tort] claims... which alone is sufficient to" entitle Defendants to judgment on the pleadings.[20] (MJP at 22–23.)

However, Defendants make no showing that applying *any* potentially applicable law would entitle Defendants to dismissal. Indeed, the only argument Defendants make regarding foreign law is that if the court were to apply Australian law, "it would need to consider the fact that the Institute has been enjoined by an Australian court from whaling in the Australian Whale Sanctuary, and has been flouting this injunction since 2008." (*See* MJP at 24.) Although Defendants repeatedly insist that Australian law would require the court to "consider" this injunction, they never articulate what the *impact* of doing so would be—even after Plaintiffs pointed out this omission in their opposition. (*Compare* MJP Resp. at 15–16 & n.16 *with* MJP Reply at 12.)

Choice of law will be an important aspect of this case, but Defendants have failed to demonstrate that it is outcome-determinative. Accordingly, the court denies Defendants' motion for judgment on the pleadings as to Plaintiffs' maritime tort claims.

### 5. Claim (5): Coercive Contempt Sanctions

On June 4, 2015, the court issued an order granting in part and denying in part Plaintiffs' requests for remedial contempt sanctions. (*See* Sanct. Order at 2.) Both sides agree that this resolved the issues

---

**20.** Although Plaintiffs' operative complaint makes no textual reference to the flags flown by the ships, Plaintiffs attached as exhibits photos of Defendants' ships with flags painted on them for ships they have "sunk" (*see* FAC Ex. 1 (Dkt. # 234-1) at 1) and "rammed" (*see* FAC Ex. 2 (Dkt. # 234-2) at 1). Two of the ships that have been "rammed" appear to be the Yushin Maru No. 1 and the Yushin Maru No. 3, both of which appear beneath Japanese flags. (*See id.*).

presented in claim (5). (*See* MJP at 24; MJP Resp. at 16.) Accordingly, the court dismisses this claim without prejudice.

## C. Determination

The court GRANTS IN PART and DENIES IN PART Defendants' motion for judgment on the pleadings. The court grants the motion and DISMISSES WITHOUT PREJUDICE Plaintiffs' ATS claims for funding terrorism, *see supra* Part III.B.3.b., and Plaintiffs' claim seeking coercive contempt sanctions, *see supra* Part III.B.5. The court denies the motion in all other respects.

Neither side has addressed whether Plaintiffs should be granted leave to amend their claims, and such leave is to be freely given. *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir.1999). However, Plaintiffs agree that claim (5) is moot, and amended allegations cannot save claim (3) insofar as it seeks to enjoin financing terrorism because such claims are not cognizable as a matter of law. *See supra* Parts III.B.3.b., IIL.B.5. The court therefore concludes that amendment would be futile and declines to grant leave to amend. *See Bowles*, 198 F.3d at 758 (permitting denial of leave to amend where amendment would be futile).

## IV. PLAINTIFFS' MOTION TO DISMISS

### A. Background

Defendants assert six counterclaims[21] against Plaintiffs: (1) violation of an inter-national norm against whaling (*see* 2ACC ¶¶ 59-68); (2) freedom from piracy (*see id.* ¶¶ 69-74); (3) pirate whaling (*see id.* ¶¶ 75-81); (4) freedom of safe navigation on the high seas (*see id.* ¶¶ 82-86); (5) intentional and/or negligent destruction of property, brought only by SSCS (*see id.* ¶¶ 87-93); and (6) freedom from terrorism, brought against only the Institute and Kyodo Senpaku (*see id.* ¶¶ 94-100). Plaintiffs assert that Defendants lack standing to bring counterclaims (*l*)-(4) and (6) (*see* MTD at 6-14); fail to state a claim for relief in counterclaims (*l*)-(6) (*see* MTD at 5-6, 14-23); and cannot bring counterclaim (5) because it is time-barred (*see* MTD at 4).

### B. Analysis

#### 1. Standing

Plaintiffs argue Defendants lack Article III standing[22] to bring counterclaims (*l*)-(4) and (6). (*See* MTD at 6-14.) If Defendants lack Article III standing, this court lacks subject matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir.2009).

##### a. Legal Standard

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, —— U.S. ——, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) (*quoting*

---

21. Except where otherwise specified, all Defendants assert these counterclaims against all Plaintiffs. Additionally, where used in this section, "Plaintiffs" includes Mr. Komura, the former master of the Shonan Mara No. 2. *See supra* Note 1.

22. "Standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, . . . and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (*quoting Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The court's use of the term "standing" herein refers to Article III standing, as neither party has raised prudential standing.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010)). More concisely, these requirements are known as injury, causation, and redressability. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 540, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (Roberts, C.J., dissenting). Because Defendants seek "declaratory and injunctive relief only" under counterclaims (*l*)-(4) and (6), "there is a further requirement that they show a very significant possibility of future harm; it is insufficient for them to demonstrate only a past injury." *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir.1996); *see also Lujan*, 504 U.S. at 562–64, 112 S.Ct. 2130 ("[T]he affiants' profession of an 'inten[t]' to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough.").

■■■■■ In environmental cases, injury "is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that interest is impaired by a defendant's conduct." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir.2000) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 182–83, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). "While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere aesthetic interests of the plaintiff, that will suffice." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (citing *Sierra Club v. Morton*, 405 U.S. 727, 734–36, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). An organization can have standing to sue on behalf of its members, but only if "it or its members would be affected in any of their activities or pastimes." *Sierra Club*, 405 U.S. at 735, 92 S.Ct. 1361.

As the parties invoking jurisdiction over their counterclaims, Defendants bear the burden of establishing standing. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

#### b. SSCS's "Members"

■■■■ As a threshold matter, Plaintiffs argue that SSCS has not alleged that it has "members," and thus SSCS does not have standing under *Sierra Club*. (*See* MTD at 7-9.) An association "has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit" *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Plaintiffs argue that SSCS fails to "allege that it is an organization with members (because it is not)." (MTD at 7.) SSCS responds that its employees and volunteers are "members" in the relevant sense, and that by planning future whale-watching trips to the Southern Ocean, SSCS's employees and volunteers satisfy element (a). (*See* MTD Resp. at 9.)

The law is not so formalistic as to preclude employees and volunteers from counting as members for purposes of associational standing. *See Hunt*, 432 U.S. at 345, 97 S.Ct. 2434 ("[W]hile the apple growers and dealers are not 'members' of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization."). The "indicia of membership" identified in *Hunt* are that the putative members "alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit,

through assessments levied upon them." 432 U.S. at 344–45, 97 S.Ct. 2434. However, the Ninth Circuit does not treat these specific indicia as necessary, instead focusing on the general principle that "[a]ssociational standing is reserved for organizations that 'express the[ ] collective views and protect the[ ] collective interests' of their members." *Fleck & Assocs., Inc. v. Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006) (quoting *Hunt*, 432 U.S. at 345, 97 S.Ct. 2434) (alterations in original); *see also Int'l Union, United Auto., Aerospace, & Ag. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) ("[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others."); *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir.2003) (reasoning that although the putative members "do not have all the indicia of membership that the *Hunt* apple growers and dealers possessed," there were sufficient indicia of membership "to satisfy the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy" (internal quotations omitted)).

█ SSCS makes clear that its mission is "to end the destruction of habitat and slaughter of wildlife in the world's oceans" (2ACC ¶ 2), and that its employees—most of whom are volunteers—buy into and impact that mission (*see, e.g., id.* ¶ 32). The footage submitted as an attachment to Defendants' counterclaims makes clear the commitment that SSCS's members have to its cause. (*See* 2ACC ¶ 19, Ex. 2 (Dkt.

# 250-2) (DVD on file with the court).) Thus, although SSCS makes minimal allegations about its financial contributions or managerial structure, the court finds that Defendants plead sufficient facts to allow the court to reasonably infer that· "the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy." *Mink*, 322 F.3d at 1111. The court therefore rejects Plaintiffs' argument that SSCS lacks standing to assert counterclaims on behalf of its employees and volunteers.

### c. Counterclaims (1) and (3): Whaling and Pirate Whaling

█ Plaintiffs contend Defendants have failed to allege imminent injury and thus lack standing to seek injunctive relief.[23] (*See* MTD at 9-11.) The Supreme Court has stated that an environmentalist organization's members do not demonstrate "actual or imminent" injury by declaring a general intent to visit impacted locations. *See Lujan*, 504 U.S. at 564, 112 S.Ct. 2130. *Lujan* arose out of the district court's denial of the defendant's motion for summary judgment for lack of standing. *See id.* at 559, 112 S.Ct. 2130. The plaintiffs submitted affidavits that demonstrated two members' general intent to return to the affected areas. *See id.* at 563–64, 112 S.Ct. 2130. The Supreme Court disregarded the affiants' past visits and concluded that a mere intent to return to the area— "without any description of concrete plans, or indeed any specification of *when* the some day will be"—is "simply not enought" to support the "imminent injury" element of standing. *Id.* at 564, 112 S.Ct. 2130.

---

**23.** Because Plaintiffs mount a facial attack on Defendants' standing, the court accepts as true the allegations in Defendants' counterclaims. *See Meyer*, 373 F.3d at 1039.

At the motion to dismiss stage, however, the burden on claimants asserting standing is not so demanding; indeed, "general factual allegations of injury resulting from [Plaintiffs'] conduct" may suffice. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (differentiating between a motion to dismiss and a motion for summary judgment, at which point the claimant "can no longer rest on such "mere allegations," but must "set forth" specific facts by affidavit or other evidence (citing Fed. R. Civ. P. 56(e)));" *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 n. 3, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (*"Lujan*, since it involved the establishment of injury in fact at the *summary judgment* stage, required specific facts to be adduced by sworn testimony; had the same challenge to a generalized allegation of injury in fact been made at the pleading stage, it would have been unsuccessful."); *Levine v. Vilsack*, 587 F.3d 986, 996–97 (9th Cir.2009) ("[A] court's obligation to take a plaintiff at its word at [the motion to dismiss] stage in connection with Article III standing issues is primarily directed at the injury in fact and causation issues."). The court is, however, limited from interpreting the complaint so liberally that it extends subject matter jurisdiction beyond the bounds of Article III. *See W. Mining Council .v. Watt*, 643 F.2d 618, 624 (9th Cir.1981).

Defendants allege plans comparable to those at issue in *Lujan*. As a threshold matter, it is minimally relevant that Defendants' members allegedly "routinely traveled to the Southern Ocean to observe the whales" and "have suffered severe emotional distress when observing [the Institute's] violent slaughter of the whales." (2ACC ¶ 63.) It "proves nothing" that a claimant seeking injunctive relief "had visited" the relevant areas in the past. *Lujan*, 504 U.S. at 564, 112 S.Ct. 2130. Furthermore, Defendants aver that they "do not plan to ever participate again in a South-

ern Ocean whale-protection campaign." (2ACC ¶ 5.) Defendants' do intend, however, to "return to the Southern Ocean to observe and enjoy the whales, while participating in future campaigns not directly related to whale-protection" (*id.* ¶ 63), but this declaration states only "some day" intentions that are no more concrete than those in *Lujan, see* 504 U.S. at 563–64, 112 S.Ct. 2130. On the other hand, Defendants clarify that their "planned campaigns over the next three years" will "monitor, research, and protect the vital krill population" in the Southern Ocean. (2ACC ¶ 63.) It is reasonable to infer that these "planned campaigns" will occur with regularity over the next three years (*see* 2ACC ¶ 63)—like Defendants' prior anti-whaling campaigns—and not "sometime in the next three years" as Plaintiffs infer (*see* MTD at 10). Defendants therefore provide a more concrete plan to return to the area than that was at issue in *Lujan*. (*Id.* ¶ 63.) It is reasonable to infer that Defendants' planned, imminent travels to the Southern Ocean will seek out minke whales, and that by diminishing their overall population Plaintiffs would cause aesthetic injury to Defendants. *See Lujan*, 504 U.S. at 566–67, 112 S.Ct. 2130 ("It is even plausible—though it goes to the outermost limit of plausibility—to think that a person who observes or works with animals of a particular species in the very area of the world where that species is threatened by a federal decision is facing such harm, since some animals that might have been the subject of his interest will no longer exist." (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986))).

The court also rejects Plaintiffs' argument that Mr. Watson has not alleged causation as to counterclaims (1) and (3). (*See* MTD at 11-12.) Defendants' counterclaims, construed in Defendants' favor, al-

lege planned, future trips on the part of Mr. Watson as well as other members of SSCS. (*See, e.g.,* 2ACC t 63 ("Watson intends to participate in some of these [planned] campaigns.").) The impact of an annual taking of 333 minke whales could very well disrupt the ecosystem that Mr. Watson and other SSCS members plan to visit. *See Lujan,* 504 U.S. at 566–67, 112 S.Ct. 2130; *Japan Whaling,* 478 U.S. at 230 n. 4, 106 S.Ct. 2860.

Further factual development may demonstrate that Defendants' alleged aesthetic injury or causation are too speculative or abstract to be cognizable. Of particular concern is the immense size of the Southern Ocean in comparison to the 333 minke whales that the Japanese government authorized the Institute to kill annually under NEWREP-A. (*See* 2ACC ¶ 28; *see also* MTD at 12.) However, in this facial challenge to standing at the motion to dismiss stage, the court takes Defendants' allegations as true and construes those allegations in Defendants' favor. *See African Am. Contractors,* 96 F.3d at 1207. Accordingly, the court concludes Defendants have sufficiently demonstrated imminent injury and causation as to counterclaims (1) and (3).[24]

### d. Counterclaims (2), (4), and (6): Committing and Financing Violations of International Norms Against Piracy and Unsafe Navigation

■ On the other hand, Defendants have not demonstrated a likelihood of future injury for counterclaims (2) and (4), which seek to enjoin future piracy and unsafe navigation by Plaintiffs.[25] Defen-

dants have indicated that they intend to abide by the preliminary injunction, which bars Defendants from navigating within 500 yards of Plaintiffs. (*See* Not. of Compliance at 2); *Cetacean Injunction,* 702 F.3d at 573; *Cetacean I,* 725 F.3d at 947. Defendants also "do not plan to ever participate again in a Southern Ocean whale-protection campaign (regardless of whether or not they are enjoined)." (2ACC ¶ 5.) Defendants nonetheless indicate a "direct interest in pursuing declaratory and injunctive relief against" Plaintiffs "in relation to" piracy and unsafe navigation. (*Id.*) Defendants' pleadings—and their statements at oral argument that future campaigns in the Southern Ocean are unplanned and nascent—belie the continued viability of this purported "direct interest." The lack of allegations indicating imminent proximity with Plaintiffs' vessels leads the court to conclude that even at the pleading stage, there is no "actual or imminent" injury sufficient to confer standing to Defendants on counterclaims (2) and (4). *See Lujan,* 504 U.S. at 564, 112 S.Ct. 2130.

First of all, counterclaims (2) and (4) seek injunctive relief as to Sea Shepherd vessels, and not SSCS vessels. (*See* 2ACC ¶¶ 74, 86.) As Defendants make clear, these are "independent entities." (*See* 2ACC ¶ 3.) Sea Shepherd is not a party to this suit, and Defendants have provided no reason SSCS would have standing to sue for actions taken against Sea Shepherd vessels. Plaintiffs' motion to dismiss identifies this issue (*see* MTD at 3, 12-13), and Defendants address it in their response with reference to the equitable principles

---

**24.** Because the court concludes Defendants have standing for counterclaims (1) and (3), the court expresses no opinion on whether Defendants might have standing as "next friend on behalf of the Southern Ocean whales." (MTD Resp. at 16-17; *see also* MTD at 13-14.)

**25.** The actions underlying counterclaims (2), (4), and (6) do not cause the aesthetic injury discussed in Part IV.B.1.c, and therefore that injury cannot confer standing for those counterclaims. *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130.

that underlie injunctive relief (*see* MTD Resp. at 18-19). But the elements of Article III standing are not equitable; they are constitutionally mandated components of a "case or controversy" over which federal courts assume subject matter jurisdiction. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

Moreover, the court cannot reasonably infer from Defendants' allegations that Plaintiffs have ever sought out Defendants on the high seas to commit acts of piracy or unsafe navigation. Indeed, Defendants repeatedly make clear that Defendants initiated proximity, not Plaintiffs. (*See* 2ACC ¶¶ 1 ("[Plaintiffs] have a history of protecting their illegal operations with violent and dangerous attacks *on those who seek to monitor and impede them.*"), 32 ("Manned by an international crew consisting largely of volunteers, Sea Shepherd vessels *attempted to locate and follow [the Institute]'s fleet*, and impede its illegal whale hunt."), 35 ("Sea Shepherd vessels have used various tactics over the years *to impede [the Institute]'s* illegal killing of whales, the most successful of which has been *to follow the NISSHIN MARU*, in order to prevent the transfer of whales from the harpoon ships to the NISSHIN MARU for commercial processing. In the past, *Sea Shepherd has approached the ICR ships* and attempted to throw onto their decks bottles of butyric acid.") (emphases added).) Although Defendants make plausible allegations that Plaintiffs *attacked* Defendants, Defendants' pleadings indicate those attacks were "[i]n response to efforts by SSCS and other Sea Shepherd entities to expose and impede [Defendants'] illegal whaling." (*Id.* ¶ 38.) The types of damage Defendants allege—endangering safe navigation (*id.* ¶ 40, 43, 46, 52), firing long-range acoustic devices and water cannons (*id.* ¶¶ 41, 46), ramming (*id.* ¶¶ 42, 46, 49), throwing items like grappling hooks and stun grenades (*id.* ¶¶ 49-50), stabbing (*id.* ¶¶ 49-50), and fouling rudders and propellers (*id.* ¶¶ 49, 51-52)—require proximity.

Defendants' only alleged future intentions in the vast Southern Ocean are krill campaigns. (*See id.* at 37.) During those campaigns, Defendants intend to observe the native whales and "monitor, research, and protect against the depletion of the krill population"—none of which indicates any propensity or reason to approach Plaintiffs' ships.[26] (*Id.*) Accepting as true Defendants' pledge to end their whaling

---

**26.** At oral argument, Defendants raised several novel potentialities regarding future aggression by the Plaintiffs. For instance, positing that Defendants frequently develop campaigns on short notice, counsel reasoned that future (currently unplanned) campaigns could oppose poaching. Such a campaign could bring Defendants to the perimeter of the 500-yard injunctive buffer to observe the Institute's whaling. If the injunction remains flowing in only one direction, Defendants argue, Plaintiffs could approach Defendants, harassing them with the threat of contempt sanctions. First of all, this concern is mislaid in light of the language of the injunction, which prohibits Defendants from "approach[ing] [P]laintiffs any closer than 500 yards when [D]efendants are navigating on the open sea." *Cetacean Injunction*, 702 F.3d at 573 (establishing an injunction pending appeal); *see also Cetacean I*, 725 F.3d at 947 (maintaining the injunction until further order of the Ninth Circuit). The situation Defendants posit—Plaintiffs approaching Defendants—does not violate this clear term of the injunction. Second, to reiterate—and notwithstanding Defendants' statement to the contrary at oral argument—Defendants' pleadings raise no inference that Plaintiffs initiated proximity on the open sea. (*See generally* 2ACC.) Accordingly, insofar as Defendants abide by the injunction, there is no indication of "imminent injury" Plaintiffs will inflict upon Defendants. Should Plaintiffs inflict such an injury, it could give Defendants a cause of action for damages, but without any indication of future likelihood the court cannot conclude Defendants have standing to seek injunctive relief.

campaigns, the court sees no reason to believe that injury to Defendants from Plaintiffs' piracy or unsafe navigation is imminent.[27] *See Lujan,* 504 U.S. at 564, 112 S.Ct. 2130. Accordingly, the court concludes Defendants lack standing to assert counterclaims (2) and (4).[28]

In a related vein, Defendants fail to allege imminent injury, and thus lack standing for counterclaim (6). (*See* 2ACC ¶¶ 94-100 (leveling claims against the Institute and Kyodo Senpaku for violating the Financing Convention).) Counterclaim (6) seeks injunctive relief against the Institute and Kyodo Senpaku for raising money to "perform acts of violence against persons aboard Sea Shepherd vessels." (*Id.* ¶ 98.) Sea Shepherd is distinct from SSCS, and is

not a party to this case. (*Id.* ¶ 3.) Moreover, as the court concludes above, Defendants have not demonstrated imminent injury from the Plaintiffs' piracy or unsafe navigation. By extension, they have not demonstrated imminent injury from the Institute and Kyodo Senpaku funding such activities. For these reasons, the court concludes Defendants lack standing to assert counterclaim (6).[29]

## 2. Subject Matter Jurisdiction as to Counterclaim (1): Whaling

■ Although Defendants have demonstrated standing to bring their counterclaim for whaling, the court concludes the ATS does not confer subject matter jurisdiction over that claim. The court "pre-

27. Defendants argue that this result is inconsistent or unfair if—and given the court's conclusion above, because—Plaintiffs have standing to bring their claims for funding and perpetrating piracy and unsafe navigation. (*See, e.g.,* MTD Resp. at 18.) This inconsistency is illusory and the perceived unfairness is irrelevant. Although the parties dispute who initiated piratical contact, the pleadings agree that Defendants initiated proximity on the high seas. (*See* 2ACC ¶¶ 1, 32, 35.) Defendants profess that—with or without the Ninth Circuit's injunction—they will no longer pursue their anti-whaling campaigns in the Southern Ocean. (*See id.*) Defendants' allegations—including their promised abstention from future campaigns—receive a presumption of truth when evaluating Plaintiffs' motion to dismiss. *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Those allegations make it unreasonable to believe that Defendants will suffer imminent injury from Plaintiffs' alleged behavior. However, Defendants' allegations are irrelevant when evaluating a motion to dismiss Plaintiffs' claims. Additionally, Defendants' voluntary cessation does not deprive the court of power to hear and determine Plaintiffs' case for injunctive relief. *See Laidlaw,* 528 U.S. at 189, 120 S.Ct. 693; *Walling v. Helmerich & Payne,* 323 U.S. 37, 42–43, 65 S.Ct. 11, 89 L.Ed. 29 (1944). Plaintiffs' pleadings thus provide no indication that Defendants will cease their piratical behavior, demonstrating a strong likelihood of imminent injury, whereas

Defendants profess in their pleadings the intent to abide by the injunction, making imminent injury unlikely.

28. Because the court concludes Defendants lack standing to assert counterclaim (2), it expresses no opinion on whether Defendants state a cognizable claim for relief. (*See* MTD at 19-20.)

29. Even if Defendants had standing, counterclaim (6) is subject to dismissal for failure to state a claim. Defendants state several conclusory allegations, which the court does not consider. *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937; (2ACC ¶¶ 97 ("[The Institute and Mr. Senpaku] have engaged in violations of the Financing Convention and, unless enjoined, are likely to continue to do so."), 98 ("Specifically, [the Institute and Mr. Senpaku] have unlawfully and willfully provided or collected millions of dollars intending that they be used to carry out acts in violation of the SUA Convention.").) The only relevant fact Defendants allege is that the Japanese government—a non-party to this suit—diverted tens of millions of dollars to the whaling industry, some of which were used to "provide extra security for the [Institute's] whaling fleet." (*See* 2ACC ¶ 99 (internal quotations omitted).) This is not an allegation about the Institute or Kyodo Senpaku and does not give rise to a reasonable inference of liability, and accordingly counterclaim (6) also fails on its merits.

sume[s] that a cause lies outside [its] limited jurisdiction," and the burden is on the party asserting jurisdiction to demonstrate otherwise. *Kokkonen*, 511 U.S. at 377, 114 S.Ct. 1673. Rather than demonstrate subject matter jurisdiction, however, Defendants themselves argue that "the presumption against extraterritorial application as applied by the Supreme Court in *Kiobel* might preclude this" counterclaim. (MTD Resp. at 8.) In opposition to this argument, Defendants posit that if the court has jurisdiction over Plaintiffs' injunctive action, it must have jurisdiction over Defendants' counterclaim.

The court disagrees. For reasons explained above, a piracy claim under the ATS is different than one for other international norms. *See supra* Part III.B.1.a.ii. Even assuming "[w]haling for commercial purposes, and the killing of endangered species"[30] (*see* 2ACC ¶ 61) constitute sufficiently well defined and accepted international norms under *Sosa*, *Kiobel* requires a clear statement of extraterritoriality in order to enforce that international norm abroad. *Kiobel*, 133 S.Ct. at 1669. Defendants all-but concede no such clear statement exists, and thus the court concludes it lacks subject matter jurisdiction under the ATS to adjudicate counterclaim (1).[31]

---

**30.** At oral argument, Defendants recast this putative international norm more narrowly—as against the killing of endangered and threatened whales for commercial purposes in an internationally designated whale sanctuary. This is not the norm Defendants identify in their counter-complaint (*see* 2ACC ¶¶ 59-68) (identifying "[w]haling for commercial purposes" and "the killing of endangered species" as specific, universal, and obligatory norms of international law), or in their briefing (*see* MTD Resp. at 7-8, 13-16 (same)). Because the court concludes it lacks subject matter jurisdiction over counterclaim (1), it expresses no opinion whether any of these putative international norms satisfies *Sosa*.

**31.** The Supreme Court's caution toward international comity and foreign relations further

### 3. Failure to State a Claim for Relief

The court now turns to Plaintiffs' arguments that counterclaims (3) and (5) fail to state a claim for relief.

#### a. Counterclaim (3): Pirate Whaling

Defendants' third counterclaim attempts to characterize Plaintiffs' whaling as piracy, and thus to shoehorn whaling into an enforceable international norm. (*See* 2ACC ¶¶ 75-81.) The court is unpersuaded by this creative effort. As a threshold matter, by characterizing Plaintiffs' whaling as "piracy," Defendants avoid the threshold jurisdictional barrier which led the court to dismiss counterclaim (1). *See supra* Part IV.B.2. However, the court concludes Defendants' whaling allegations do not constitute piracy.

Defendants argue that Plaintiffs' whaling constitutes "acts of 'violence, detention [and] depredation' in furtherance of 'private ends.'" (*Id.* ¶ 80 (quoting *Cetacean I*, 725 F.3d at 943).) Even assuming this is true, Defendants' definition omits the requirement that such acts be committed "against another ship or aircraft, or against persons or property on board such ship or aircraft." UNCLOS art. 101; *see*

supports this conclusion. *See Kiobel*, 133 S.Ct. at 1664; *Sosa*, 542 U.S. at 725, 124 S.Ct. 2739. Since 1987, Japan has expressed at least tacit disagreement with the international norm that Defendants advance. (*See* ICJ Ruling ¶¶ 99-100.) Australia asserts jurisdiction over the Southern Ocean and has issued its own rulings regarding whaling there, which are contrary to Japan's special permits under which the Institute currently whales. (*See* Not. of Supp. Authority (Dkt. # 290) at 2, Ex. A (Dkt. # 290-1) at 1-2.) These circumstances illustrate the delicate international situation surrounding the propriety and legality of whaling in the Southern Ocean—one in which an American federal court should be reluctant to intervene.

*also Cetacean I*, 725 F.3d at 943. Plaintiffs base their motion to dismiss counterclaim (3) on this element, and Defendants respond only that "the Institute plunders and pillages the whales that [Defendants] have sought to protect, and in that sense, its piracy is 'directed against' [Defendants] and their ships." (MTD Resp. at 22.) This suggestion stretches the clear meaning of piracy beyond reason. Among other nonsensical results, Defendants' interpretation would allow any seaman with a special affinity for a sea creature—say, a tuna—to state a piracy claim against a fisherman. In light of the narrow construction the Supreme Court has directed in the realm of customary international law, the court cannot go so far. *See Sosa*, 542 U.S. at 725, 124 S.Ct. 2739. Accordingly, the court finds Defendants have failed to state a claim for "pirate whaling," and the court dismisses counterclaim (3).

### b. Counterclaim (5): Destruction of Property

 Plaintiffs argue that counterclaim (5), which seeks damages for Defendants' negligent or intentional destruction of property (*see* 2ACC ¶¶ 87-93), should be dismissed to the extent it refers to Sea Shepherd—and not SSCS—vessels (*see* MTD at 5-6).[32] According to Defendants, two incidents give rise to damages liability: (1) the Shonan Maru No. 2 rammed the Ady Gil in January 2010 (*see* 2ACC ¶ 42); and (2) the Yushin Maru No. 3 rammed the Bob Barker in February 2010 (*see id.* ¶ 41). SSCS alleges it operated the Ady Gil "under a very favorable charter agreement" (*see* 2ACC ¶ 33), which Plaintiffs concede supports a claim in favor of Defendants (*see* MTD at 5 n.3). Defendants

also seek to recover damages for harm to the Bob Barker, the crews of the Ady Gil and the Bob Barker, and "other Sea Shepherd vessels and equipment." (2ACC ¶ 88, 91-93.) Plaintiffs contend, however, that SSCS does not allege a proprietary interest in any of those items except the Ady Gil, and thus cannot state a claim for damages. (*See* MTD at 5 (citing *Nautilus Marine, Inc. v. Niemela*, 170 F.3d 1195, 1196 (9th Cir.1999)).)

Defendants respond by citing Plaintiffs' amended complaint, which alleges both that the Bob Barker was an "SSCS vessel" during the 2009-2010 whaling season (Am. Compl. 115.3), and that SSCS subsequently granted the Bob Barker to foreign Sea Shepherd entities (*see, e.g., id.* ¶ 27). Defendants also contend that their answer admits ownership of the Bob Barker by stating that "it had 'employed' the Bob Barker in the Southern Ocean as late as the 2011-2012 season." (MTD Resp. at 25 (quoting FAC Ans. 120).) However, merely "employ[ing]" the ship during the relevant period does not entail a proprietary interest. Moreover, the court does not consider the complaint or answer thereto in a motion to dismiss counterclaims—only the "counter complaint, any exhibits thereto, and matters which may be judicially noticed." *See Aagard v. Palomar Builders, Inc.*, 344 F.Supp.2d 1211, 1214 (E.D.Cal. 2004). Whereas Defendants may be correct that counterclaim (5) "could easily be amended to specifically allege that the SSCS had a proprietary interest in the Bob Barker in 2010," that allegation is not currently among the pleadings the court may consider. (MTD Resp. at 25.) Accord-

---

**32.** Plaintiffs also argue the entirety of counterclaim (5) should be dismissed on statute-of-limitations grounds. (*See* MTD at 4.) In doing so, Plaintiffs incorporate their arguments from their motions for partial summary judgment. (*See id.* (referencing 4/9/15 MPSJ).)

Rather than parse Plaintiffs' motion for summary judgment for the portions properly considered at the motion to dismiss stage, the court addresses these arguments below. *See infra* Part V.

ingly. the court dismisses the portions of counterclaim (5) that seek recompense for damages to any individual or vessel other than the Ady Gil.

### 4. Failure to Serve

■■■ Additionally, Plaintiffs argue that Mr. Komura should be dismissed as a party because he has never been served. (*See* MTD at 6.) Defendants make no representation that they have made any effort to serve Mr. Komura in the almost four years that have passed since his summons issued. (*See* MTD Resp. at 23 n. 11; Summons (Dkt. # 99).) Instead, they argue that they have "no time limit for effecting service on [Mr.] Komura" because he is located in a foreign country. (MTD Resp. at 23 n.l 1); *see also* Fed. R. Civ. P. 4(m) (exempting "service in a foreign country" from the 120-day deadline); *Lucas v. Natoli*, 936 F.2d 432, 432 (9th Cir.1991). The Ninth Circuit reads Rule 4(m) to completely exempt foreign defendants from the 120-day service deadline. *See Lucas*, 936 F.2d at 432; *cf. Lozano v. Bosdet*, 693 F.3d 485, 488–89 (5th Cir.2012) (reading *Lucas* to conclude that "when the defendants are foreign, an unlimited window-of-opportunity for service ... exists," and rejecting that interpretation in favor of a "flexible due diligence" standard). However, this does not preclude the court from "setting a reasonable time limit for service in a foreign country to properly manage a civil case." *Baja Devs. LLC v. TSD Loreto Partners*, NO. CV–09–756–PHX–LOA, 2009 WL 2762050, at *1 (D.Ariz. Aug. 26, 2009); *see also Logtale, Ltd. v. IKOR, Inc.*, No. C 11–5452 CW, 2013 WL 4427254, at *7 (N.D.Cal. Aug. 14, 2013) (analyzing whether a party's failure to serve a foreign defendant over an eleven month period was "deliberate" and whether opposing parties were prejudiced by the delay).

Because Rule 4(m) does not set a deadline for service in a foreign country, and the court has not previously set a deadline for service, the court will not dismiss Mr. Komura at this time. *See Lucas*, 936 F.2d at 432. However, Defendants' apparent failure to make any efforts at service troubles the court, which will not allow an unlimited time for service. *See Baja Devs.*, 2009 WL 2762050, at *1–2 (noting that "Plaintiff has offered to provide specifics of its service attempts"); *Nylok Corp. v. Fastener World Inc.*, 396 F.3d 805, 807 (7th Cir.2005) ("[T]he amount of time allowed for foreign service is not unlimited."). The court therefore DIRECTS Defendants to effect service on Mr. Komura by April 30, 2016. If Defendants cannot do so, they are to file a status report detailing their efforts to serve Mr. Komura, at which point the court may revisit whether dismissal is appropriate for failure to serve.

### C. Determination

The court GRANTS IN PART and DENIES IN PART Plaintiffs' motion to dismiss. The court DISMISSES WITHOUT PREJUDICE counterclaims (2), (4), and (6) for lack of standing, DISMISSES WITHOUT PREJUDICE counterclaim (1) for lack of subject matter jurisdiction, DISMISSES WITHOUT PREJUDICE counterclaim (3) for failure to state a claim, and DISMISSES WITHOUT PREJUDICE those aspects of counterclaim (5) that seek redress for damages to any individual or vessel other than the Ady Gil, for failure to state a claim.

Neither party has addressed whether Defendants should have leave to amend their counterclaims, and such leave is to be freely given. *Bowles*, 198 F.3d at 757. The court therefore GRANTS Defendants thirty (30) days from the filing of this order to amend their counterclaims to remedy the deficiencies identified herein. If Defendants opt to amend their counterclaims, they should be clear what past and future

events involve SSCS entities as opposed to Sea Shepherd entities, because Defendants have not demonstrated a basis for standing as it relates to Sea Shepherd. Given this order's thorough discussion of the pleading deficiencies in Defendants' second amended counterclaims, the court will treat similar shortcomings in future pleadings as evincing the futility of further amendment.

## V. PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON COUNTERCLAIM (5)

Plaintiffs seek partial summary judgment on counterclaim (5). Plaintiffs first moved for partial summary judgment on April 9, 2015, seeking to dismiss part of counterclaim (5) on statute-of-limitations grounds. (*See generally* 4/9/15 MPS J.) On July 16, 2015, Plaintiffs moved for partial summary judgment on the entirety of counterclaim (5), incorporating by reference their April motion for partial summary judgment. (*See* 7/16/15 MPS J.)

The court has dismissed the portions of counterclaim (5) that seek damages for attacks on Sea Shepherd vessels, as opposed to SSCS vessels. *See supra* Part IV.B.3.b. Part of Plaintiffs' motions for partial summary judgment are therefore moot. Moreover, the Western District of Washington's local rules prohibit filing "contemporaneous dispositive motions, each one directed toward a discrete issue or claim" without leave of the court. Local Rules W.D. Wash. LCR 7(e)(3). This rule seeks to avoid the inefficiencies caused by duplicative dispositive motions and circumvention of the court's page limits. In light of the court's ruling herein, which moots part of the motion, and because of the circuitous internal references in the relevant motions, the court finds it inefficient to consider them at this juncture. Accordingly, the court DENIES both motions for partial summary judgment WITHOUT PREJUDICE to reraising the issues that remain in light of this order.

## VI. DEFENDANTS' MOTION TO COMPEL

Defendants move to compel Plaintiffs to respond to Defendants' third interrogatories and produce documents responsive to Defendants' third requests for production ("RFPs"). (*See* MTC at 1.) Plaintiffs broadly object to this discovery, in part on the grounds that Defendants' defenses and counterclaims lack merit, and thus the information is irrelevant (*See MTC* Resp. at 4-13.) This order clarifies which of Plaintiffs' and Defendants' claims and counterclaims can move forward, removing the hypothetical element from counsel's arguments as to relevance. Accordingly, the court finds moot or inapposite many of the arguments and defenses propounded in the relevant briefing. The court therefore DENIES the motion WITHOUT PREJUDICE to reraising any disputes that the parties cannot resolve at a meet and confer held in light of this order.

## VII. DEFENDANTS' MOTION TO CONFIRM TERMINATION OF CONFIDENTIALITY AGREEMENT

■ On July 13, 2015, Defendants provided notice to Plaintiffs of their intent to terminate the confidentiality agreement that the parties entered into in July 2012. (*See* MTCT at 1; *see also* 9/14/15 Neupert Decl. re MTCT (Dkt. # 281) ¶ 2, Ex. 1 ("Confidentiality Agreement").) Plaintiffs take the position that Defendants cannot unilaterally terminate the confidentiality agreement. (*See* MTCT Resp. at 2.)

The agreement at issue was never entered as a court order. (*See generally* Dkt.). Judge Jones, who presided over the case when the parties reached the agreement, does not enter confidentiality agreements as orders of the court. (*See* 9/14/15 Neupert Decl. re MTCT ¶ 4, Ex. 2 ("Jones Rules") at 1.) Judge Jones' policy is to "enforce the parties' agreement regarding confidentiality of documents as it would

enforce any agreement between the parties," so long as it comports with Local Rule 5(g). (*Id.* (citing Local Rules W.D. Wash. LCR 5(g)).) Judge Jones did not, however, "transform th[e] agreement into an order of the court." (*Id.*)

Pursuant to Judge Jones' rules, the court understands the agreement as a simple contract and interprets it accordingly. (*Id.*) In opposition to the motion, Plaintiffs make a series of arguments that indicate not that the contract is interminable, but that the contract applies indefinitely to documents produced while the contract was in effect. (*See, e.g.,* MTCT Resp. at 5 ("[T]he intent that the Agreement is not subject to unilateral termination is demonstrated by the fact that the terms 'survive the final termination of this proceeding,' indicating that the parties intended the agreement to run either in perpetuity or, at a minimum, until some point after the conclusion of litigation.").) But Defendants concur that "discovery produced while the [agreement] was in force will continue to be treated according to its terms." (MTCT at 4.)

Concerning whether the agreement is terminable as applied to future discovery, Plaintiffs only point out that it is "silent on the subject of termination," and argue that if it had been a court order, it would not have been terminable at will. (*Id.*) These arguments miss the point. The agreement is a private contract without a termination clause. (*See generally* Confidentiality Agreement.) With reasonable notice, a "contract for continuing performance" that fails to "specify the intended duration" is "terminable-at-will by either party after a reasonable time." *See Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co.,* 135 Wash.App. 760, 145 P.3d

1253, 1256 (2006) (citing *Robbins v. Seattle Peerless Motor Co.,* 148 Wash. 197, 268 P. 594, 594 (1928)). There is no termination clause in the agreement, and Plaintiffs do not dispute that Defendants provided Plaintiffs with reasonable notice. (*See generally* MTCT Resp.) Accordingly, the court concludes that the contract is terminated. The court will, however, enforce the agreement as to previously produced documents, insofar as the agreement comports with the Local Rules.

The court GRANTS Defendants' motion to confirm the termination of the confidentiality agreement. At oral argument, the parties indicated a willingness to seek common ground on a stipulated protective order. If they fail in that endeavor, the court will consider the parties' positions and craft an appropriate protective order on its own.

## VIII. CONCLUSION

The court GRANTS IN PART and DENIES IN PART Defendants' motion for judgment on the pleadings (Dkt. # 260), GRANTS IN PART and DENIES IN PART Plaintiffs' motion to dismiss (Dkt. # 255), DENIES Plaintiffs' motions for partial summary judgment on Defendants' fifth counterclaim (Dkt. ## 228, 257), DENIES Defendants' motion to compel (Dkt. # 271), and GRANTS Defendants' motion to confirm termination of the confidentiality agreement (Dkt. # 272).[33] The court GRANTS Defendants 30 days to amend their counterclaims. The court DIRECTS Defendants to serve Mr. Komura by April 30, 2016.

---

**33.** Any party seeking to file a further motion in this case should notify opposing counsel of the nature of the proposed motion and seek leave of the court by filing a submission of no more than two pages. (*See* Min. Ord. (Dkt. # 289).) Within two days, computed in accordance with the Local Rules, the other party may file a response of no more than two

pages. *See* Local Rules W.D. Wash. LCR 6(a). The court will then schedule a telephone conference to consider allowing the motion to be filed.